**SOUTH BEND LATHE, INC.,**
**Plaintiff–Appellee–Cross**
**Appellant,**

v.

**AMSTED INDUSTRIES, INC., Defendant–Appellant–Cross Appellee.**

**Nos. 90–1978, 90–2041.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 8, 1991.
Decided Feb. 22, 1991.

James H. Pankow, John B. Ford, Jones, Obenchain, Ford, Pankow & Lewis, South Bend, Ind., for plaintiff-appellee-cross appellant.

Alan S. Rutkoff, David Bayless, McDermott, Will & Emery, Chicago, Ill., Terence

M. Austgen, Singleton, Levy & Crist, Munster, Ind., Lawrence L. Summers, Chicago, Ill., for defendant-appellant-cross appellee.

Before BAUER, Chief Judge, WOOD, Jr., Circuit Judge, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

This appeal concerns the meaning of an indemnity provision in a contract for the sale of a business. By an agreement effective June 30, 1975 (the "Agreement"), Amsted Industries, Inc. ("Amsted") sold its Johnson toolmaking division to LWE, Inc., which we refer to by its current name, South Bend Lathe, Inc. ("South Bend"). As part of the sale, the parties divided responsibility for Johnson's liabilities. South Bend assumed liability for defects in Johnson products shipped after the effective date of the Agreement. Although it now disputes the point, Amsted essentially took responsibility for defects in Johnson products shipped before that date, and agreed to indemnify South Bend for claims that South Bend might have to pay arising out of such products.

Product liability suits arising from Johnson products shipped from 1937 to 1962 forced South Bend to pay $224,724.43 in damages and legal fees. Amsted, however, denied any responsibility to indemnify South Bend for these suits, leading South Bend to bring the present diversity action arising under Illinois law. Following a bench trial, the District Court awarded South Bend indemnity for the $224,724.43, plus legal fees in the present case of $162,-885.86, and declared the rights and obligations of the parties regarding future product liability claims. Amsted appeals this judgment, and South Bend cross-appeals the District Court's denial of prejudgment interest. We affirm except as to the denial of prejudgment interest. The expenses that are the basis for the District Court's judgment were known to the penny at the time that South Bend incurred them, mandating an award of prejudgment interest under Illinois law.

## Amsted's Obligation to Indemnify South Bend

The District Court concluded that the Agreement requires Amsted to indemnify South Bend for the $224,724.43 it has paid in product liability claims and attorneys' fees arising from defects in Johnson products shipped from 1937 to 1962. The District Court also ordered Amsted to pay South Bend's attorneys' fees of $162,885.86 in the present action, which Amsted apparently disputes only to the extent that the underlying indemnity award was improper. In any event, it has not raised any arguments to distinguish the two. This Court reviews the District Court's award *de novo* because it turns solely on the written words of the Agreement. *See, e.g., Lowrance v. Hacker*, 888 F.2d 49, 51 (7th Cir. 1989).

The Agreement's terms lead us to the same conclusion that the District Court reached. Under the Agreement, South Bend is responsible for "product liability claims arising with respect to goods ... which are shipped *after June 30, 1975*" and "none other." Agreement ¶ 3.1 (emphasis added). For its part, Amsted must indemnify South Bend for "any liability or obligation of Amsted other than the liabilities and obligations to be assumed by [South Bend]." *Id.* at ¶ 10.1. The most reasonable interpretation of this language is that South Bend is responsible for defects in products shipped after June 30, 1975, and Amsted for defects in products shipped before. This interpretation establishes Amsted's obligation to indemnify South Bend. The claims at issue are product liability claims arising from Johnson products shipped before June 30, 1975. Amsted, not South Bend, bears the responsibility for such claims under the Agreement.

Amsted seeks to avoid this conclusion by focusing on the nature of the claims in dispute. Amsted contends, and South Bend apparently agrees, that those claims arise under the "product line" rule of liability, which several states (but not Illinois) have adopted. Under this rule, a corporation that sells its goods under a trade name

previously used by another company may be liable for defects in the prior company's products, at least where the prior company no longer exists. *See, e.g., Ramirez v. Amsted Industries, Inc.,* 86 N.J. 332, 431 A.2d 811 (1981); *Ray v. Alad Corp.,* 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977). The rationale is, in part, that the later company profits from the good will that the prior company established in the trade name, so the later company should bear the economic consequences of past mistakes rather than the random users of the product who suffer injury. *See, e.g., Ramirez,* 431 A.2d at 820; *Ray,* 136 Cal. Rptr. at 576, 560 P.2d at 5.

The product line rule had not been accepted by any state appellate court when the Agreement was executed in 1975. Amsted argues that the Agreement must be interpreted in light of the law in effect at the time of its execution, *see, e.g., Lincoln National Life Ins. Co. v. Watson,* 71 Ill. App.3d 900, 903, 28 Ill.Dec. 339, 342, 390 N.E.2d 506, 509 (1979), and contends that this precludes indemnity for then-non-existent liabilities. Amsted further argues that the Agreement's language supports its view. Under the Agreement, Amsted is obligated to indemnify South Bend only for liabilities "of Amsted." Agreement, ¶ 10.1. But the claims in dispute are not liabilities "of Amsted," the argument goes, because they arise from products shipped from 1937 to 1962, before Amsted acquired Johnson. Under this view, any liability that South Bend faces from these claims is a liability "of South Bend," not "of Amsted," in that Amsted and South Bend are equally innocent of any wrongdoing. Amsted buttresses its position with the Illinois rule that indemnification agreements are to be construed against the indemnitee. *See, e.g., Ervin v. Sears Roebuck & Co.,* 127 Ill. App.3d 982, 82 Ill.Dec. 709, 715, 469 N.E.2d 243, 249 (1984). In particular, "an agreement will not be construed as indemnifying a party against its own strict liability unless the language of that agreement clearly and specifically shows that this was the intent of the parties." *Smith v. Clark Equipment Co.,* 136 Ill.App.3d 800, 805, 91 Ill.Dec. 520, 524, 483 N.E.2d 1006, 1010 (1985). Amsted also argues that indemnification conflicts with the purposes of the product line rule. Again, part of the rationale for that rule is that a party that derives *current* benefit from a trade name should bear the liabilities associated with that name. Amsted urges that its sale of Johnson to South Bend ended any benefit that Amsted could derive from the Johnson name. In sum, Amsted argues that the parties' intent, the contractual language, Illinois' rules of construction, and the purposes of the product line rule are all inconsistent with requiring Amsted to indemnify South Bend for liabilities arising under the rule.

These points are unpersuasive. Amsted's strongest position would be that the non-existence of product line liability in 1975 shows that the Agreement is ambiguous. Ambiguity may be intrinsic in the words of a contract or may arise from extrinsic facts. *See generally Federal Deposit Insurance Corp. v. W.R. Grace & Co.,* 877 F.2d 614, 620–621 (7th Cir.1989) (applying Illinois law). Along these lines, Amsted could argue that the subsequent change in the law renders ambiguous the otherwise clear language of the Agreement. The parties spoke plainly, but they still may not have meant for their plain language to apply to a form of liability that did not exist at the time. If Amsted had argued that the Agreement suffers from this kind of ambiguity, it might have been able to present evidence in the District Court bearing on the parties' intent regarding indemnification.

The problem is that Amsted's position here and in the District Court has been that the Agreement is *not* ambiguous and that extrinsic evidence should *not* be considered to determine its meaning. *See* Memorandum and Order (March 30, 1990), p. 7; Amsted's Reply Brief, pp. 6–7. This position should not be thought a blunder on Amsted's part. The outside evidence includes an admission by Amsted's counsel in other litigation that it is liable to South Bend for indemnity of the product line claims at

issue here,[1] and suggests a course of dealing between the parties that undercuts Amsted's current position. Amsted may well have concluded that it stood a better chance of prevailing by confining the case to the words of the Agreement and avoiding any argument that the Agreement has extrinsic ambiguity.

Although Amsted's choice may have been sound strategy, the cost to Amsted is that it becomes irrelevant that product line liability did not exist at the time that the parties executed the Agreement. True, Illinois law requires that a contract be interpreted in light of the law that exists at the time of its execution. But the words of the Agreement leave nothing to interpret. The Agreement's language is intrinsically plain in apportioning responsibility for "product liability claims." Agreement, ¶ 3.1(b). Without dispute, product line claims are a form of "product liability claim," and they were recognized as such in 1975 even by courts that rejected the doctrine. *See, e.g., Ortiz v. South Bend Lathe*, 46 Cal.App.3d 842, 120 Cal.Rptr. 556 (1975). Product line claims are thus within the terms of the Agreement. Having given up the opportunity to argue extrinsic ambiguity, Amsted must live with the Agreement's terms.

When it tries to work within those terms, Amsted fares no better. As Amsted has emphasized, the Agreement requires it to indemnify South Bend only for liabilities "of Amsted." But the claims at issue *are* liabilities "of Amsted." Amsted concedes that it could have been sued in place of South Bend on any of these claims. *See* Amsted's Brief, p. 16; Amsted's Reply Brief, p. 5. And South Bend's liability depends on Amsted's—"If Amsted could not be liable ... [for product line claims] then neither could South Bend." *Nguyen v. Johnson Machine & Press Corp.*, 104 Ill. App.3d 1141, 60 Ill.Dec. 866, 868, 433 N.E.2d 1104, 1106 (1982). Amsted avoided direct liability only because the plaintiffs for the claims at issue chose to proceed against South Bend rather than Amsted. This choice does not make these claims any less Amsted's liability, at least for indemnity purposes. Indemnity *presupposes* that South Bend is sued, under one theory or another, for an obligation that would otherwise be Amsted's.

Viewed differently, Amsted's position is essentially that a liability "of Amsted" means a liability "caused by Amsted's fault." The problem is that the Agreement does not say this. What's more, this interpretation is implausible given that the Agreement extends to other types of products liability, which are strict liabilities not based on traditional fault principles. Indeed, fault is irrelevant from South Bend's perspective. South Bend is just as bad off if it inherits a liability due to Amsted's fault as it is if it inherits a liability due to any other pre–1975 cause. The better view is that the "of Amsted" language has nothing to do with fault. Instead this language follows the temporal division of liability that the rest of the Agreement sets forth. Liabilities that arise from pre–1975 causes

---

1. The [Johnson] manufacturing business was operated by Amsted until June 1975, at which time the business was sold to ... [South Bend]. As part of this transaction, Amsted agreed to indemnify South Bend [ ] for any losses arising out of machinery manufactured and sold prior to the date of closing. Amsted acknowledges that by virtue of the indemnity agreement, it is responsible for the defense against and payment of any liability claims against South Bend [ ] arising out of any defects in the Johnson product line.

*Ramirez v. Amsted Industries, Inc.*, 86 N.J. 332, 431 A.2d 811, 814 (1981); *see also Fish v. Amsted Industries, Inc.*, 126 Wis.2d 293, 376 N.W.2d 820, 822 (1985) (stating, "Amsted agreed to indemnify South Bend [ ] for any liability claims arising out of the Johnson press line").

Because it is included in the decision of the New Jersey Supreme Court, Amsted's admission of liability to South Bend is not only evidence of intent regarding the indemnity provision, but also potentially a matter of issue preclusion (offensive collateral estoppel). In general, federal courts must give a state court's judgment the same preclusive effect in subsequent litigation that state's own courts would give. 28 U.S.C. § 1738; *Charles Koen & Assoc. v. Cairo*, 909 F.2d 992, 996–97 (7th Cir.1990). New Jersey recognizes issue preclusion, or offensive collateral estoppel, as being subject to the discretion of the trial court in the subsequent litigation. *See Kortenhaus v. Eli Lilly & Co.*, 228 N.J.Super. 162, 549 A.2d 437, 439 (1988). Because the District Court in the present case did not rely on the doctrine in its decision, we do not consider it further.

are liabilities "of Amsted." Those that arise from post–1975 causes are "of South Bend."

The discussion to this point also disposes of Amsted's claim that Illinois' rule for construing indemnity agreements prevents South Bend's recovery. Illinois courts allow a party to obtain indemnity for its strict liability only if "the language of th[e] agreement clearly and specifically shows that this was the intent of the parties." *Smith v. Clark Equipment Co.*, 136 Ill. App.3d 800, 805, 91 Ill.Dec. 520, 524, 483 N.E.2d 1006, 1010 (1985). But the rule is porous. In *Patton v. T.O.F.C., Inc.*, 79 Ill.App.3d 94, 34 Ill.Dec. 638, 398 N.E.2d 313 (1979), the court of appeals found that the agreement at issue demonstrated the parties' intent to include strict liabilities because of its reference to "legal proceedings ... which may be attributable to any *defect*" in the equipment at issue. The court reasoned that the role of "defects" as an element in product liability cases made the term sufficient to demonstrate the parties' intent to indemnify for strict product liabilities. *Id.*, 79 Ill.App.3d at 99, 34 Ill. Dec. at 842, 398 N.E.2d at 317. Similarly, in *Owens v. Midwest Tank and Mfg. Co.*, 192 Ill.App.3d 1039, 140 Ill.Dec. 123, 549 N.E.2d 774 (1989), the court ordered indemnity because of the parties' reference to "modification" and "misuse" in their agreement, "terms particular to product liability actions ... evinc[ing] an intent by the parties that the provision would apply to product liability claims." *Id.*, 140 Ill.Dec. at 126, 549 N.E.2d at 777. Again, in the present case, the Agreement specifically extends to "product liability claims." Agreement, ¶ 3.1(b). This specific reference to strict liability claims is compelling when contrasted with the oblique references to such claims that the Illinois courts accepted in *Patton* and *Owens*. The parties' intent to include strict liabilities in the Agreement is unmistakable.

Finally, Amsted claims that the rationale for the product line rule does not support indemnification because Amsted is not making Johnson products anymore. This argument is irrelevant. It is the terms of the Agreement, not the policy behind the product line rule, that is the basis for indemnification in this case.

In fact, Amsted's policy argument fails on its own terms. The product line rule is based on three considerations, which we paraphrase slightly:

(1) the destruction of an injured party's remedies caused by the successor's acquisition of the business;

(2) the successor's ability to spread the cost of injuries; and

(3) the benefit that the successor reaps from its predecessor's good will.

*See Ray v. Alad Corp.*, 19 Cal.3d 22, 31, 136 Cal.Rptr. 574, 560 P.2d 3 (1977); *see also Martin v. Abbott Laboratories, Inc.*, 102 Wash.2d 581, 689 P.2d 368, 387–8 (1984) (en banc); *Ramirez v. Amsted Industries, Inc.*, 86 N.J. 332, 349, 431 A.2d 811, 820 (1981); *Dawejko v. Jorgensen Steel Co.*, 290 Pa.Super. 15, 22, 434 A.2d 106, 109 (1981).

The first consideration, the destruction of an injured party's remedies, is dispositive in this case. Amsted, South Bend's predecessor, remains a viable company capable of satisfying judgments against it. The continuation of the predecessor corporation bars recovery from the successor under the product line rule in every decision we have found that considers the issue. *See, e.g., Phillips v. Cooper Laboratories*, 215 Cal.App.3d 1648, 264 Cal.Rptr. 311, 316 (1989); *Wilkerson v. C.O. Porter Machinery Co.*, 237 N.J.Super. 282, 289–291, 567 A.2d 598, 601–602 (1989); *Hall v. Armstrong Cork, Inc.*, 103 Wash.2d 258, 692 P.2d 787, 790 (1984) (en banc). These cases make clear that the rationale of the product line rule does not extend to South Bend.[2] Indemnification in this case

---

**2.** So how has South Bend incurred any liability under the product line rule at all? For the most part it hasn't. Legal fees in defending actions constitute almost all of the expenses that are the subject of the District Court's indemnity order.

For the few settlements that South Bend has made, the record on appeal contains little information, and we are left to the parties' characterization of these claims as deriving from the product line rule.

presents no conflict with the rule.[3]

To recap, the indemnification provision is plain that Amsted is liable for the claims at issue. Amsted's various arguments in favor of an elaborate exception to the contractual language are unpersuasive. This Court agrees with the District Court that Amsted must indemnify South Bend.

### The District Court's Declaration of the Parties' Future Rights and Obligations

■ For some product liability claims, Amsted and South Bend are each liable and responsibility needs to be apportioned. For example, an injured plaintiff might show defects in pre–1975 design (for which Amsted would have to indemnify South Bend) and in post–1975 replacement parts (for which South Bend would bear liability). In its opinion, the District Court stated that "[f]airness dictates that ... the parties must split the expenses evenly" for suits involving this sort of shared liability. Memorandum and Order, p. 12; *see id.*, pp. 21–22. Amsted urges, with some force, that any apportionment must turn on the facts of each case.

This issue, however, is not properly before this Court. The District Court made its statement only in its opinion, not in its entry of judgment. "The opinion is not itself a declaratory judgment, which must be set forth on a separate paper." *Foremost Sales Promotions, Inc. v. Director, Bureau of Alcohol, Tobacco, & Firearms,* 812 F.2d 1044, 1045 (7th Cir.1987). In its judgment, the District Court stated only that it would retain jurisdiction to resolve any disputes about apportionment of liability for any future claims. This much is certainly proper.

Further, the parties disagreed at oral argument about the cases to which the District Court's language would apply. According to South Bend, the District Court meant that it would apportion liability 50–50 only if the facts of the case at issue presented no other clear method of making the division. Amsted, on the other hand, argues that the District Court meant to divide liability 50–50 in every case in which liability was shared, even if the facts showed that one party was much less at fault than the other. Certain of the District Court's language supports Amsted's view of the Order, but without an actual case before us we are not certain how the District Court plans to proceed. The District Court has retained jurisdiction to apportion liability in subsequent cases as disputes arise, and the parties will of course be free to appeal the District Court's division if any error is present. Until then, our inability to predict how the District Court will apply its declaratory order indicates that the issue is not ripe for appellate review. *See, e.g., Koch Refining v. Farmers Union Central Exchange, Inc.,* 831 F.2d 1339, 1353 (7th Cir.1987) (finding no ripeness where the harm to the appellant is "still conjectural rather than actual"), *cert. den.,* 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988); *Matterhorn, Inc. v. NCR Corp.,* 727 F.2d 629, 632 (7th Cir. 1984) (stating that an issue is ripe for appellate review when " 'it is apparent that subsequent rulings of the trial court are not going to moot the issues that the appellant would like to present' "), *quoting University Life Ins. Co. v. Unimarc Ltd.,* 699 F.2d 846, 849 (7th Cir.1983).

### Prejudgment Interest

■ South Bend cross-appeals seeking prejudgment interest. Illinois courts interpret the governing statute, Ill.Rev.Stat., ch.

---

3. Amsted's argument jumps to the third prong of the product line analysis, that a company that profits from the good will in a trade name should be liable for defects in prior products manufactured under that name. But Amsted is incorrect to argue that this consideration militates against its bearing responsibility for the claims at issue. Amsted profited from the Johnson name while it manufactured products under that name. Further, Amsted profited from the *future use* of the Johnson name when it sold that name. In economic terms, Amsted's selling price for the Johnson name should have been the net present value of the income stream that name would generate in the future. Because Amsted has, or should have, profited from the use of the Johnson name after the selling date, it is consistent with the "good will" basis for the product line rule for Amsted to bear the cost of injuries after that date.

17, ¶ 6402, as requiring an award of prejudgment interest in cases in which there is an amount due "in the sense that a debtor-creditor relationship has come into being" and the amount due was "fixed or easily computed" prior to judgment. *Advance Mortgage Corp. v. Concordia Mutual Life Assoc.*, 135 Ill.App.3d 477, 90 Ill.Dec. 225, 231, 481 N.E.2d 1025, 1031 (1985); *Servbest Foods, Inc. v. Emessee Industries, Inc.*, 82 Ill.App.3d 662, 37 Ill.Dec. 945, 957, 403 N.E.2d 1, 13 (1980).

The Illinois cases hold that a contractual obligation is sufficient to establish a debtor-creditor relationship. *See, e.g., Advance Mortgage*, 90 Ill.Dec. at 228–30, 481 N.E.2d at 1028–30 (holding that a mortgage servicer's payment of taxes and insurance premiums created a right of reimbursement from the mortgage holder that mandated an award of prejudgment interest). Amsted's contractual obligation to indemnify South Bend thus created a debtor-creditor relationship.

This leaves the question of whether the amount owed was "fixed or easily computed" prior to judgment. Under Illinois law, "[p]rejudgment interest *will be* granted ... even where the claimed right and the amount due require legal ascertainment." *Id.*, 90 Ill.Dec. at 231, 481 N.E.2d at 1031 (emphasis added). In the *Advance Mortgage* case cited, the appellate court modified the trial court's award to add prejudgment interest where damages were "set forth on the sheet showing plaintiff's itemized ... advances, totalling the exact sum." *Id.* Nothing distinguishes the present case. Here the District Court's award is based on a list of actual settlements and attorneys' fees which were known to the penny at the time South Bend incurred them. For this reason, we reverse the District Court's denial of prejudgment interest and remand for calculation of the interest due based on the various dates that South Bend actually paid the expenses for which it is entitled to indemnity.

### Conclusion

For the reasons stated, the District Court's judgment is AFFIRMED, except as to its denial of prejudgment interest, which is REVERSED and REMANDED for determination of the interest due.