**Ramiro GUERRERO, as Administrator of the Estate of Carlos Guerrero, Deceased, Appellants–Petitioners,**

v.

**ALLISON ENGINE COMPANY, Appellee–Respondent.**

No. 49A02–9905–CV–362.

Court of Appeals of Indiana.

March 22, 2000.

David C. Krahulik, Yosha Krahulik & Levy, Indianapolis, Indiana, Attorney for Appellants.

Lloyd H. Milliken, Jr., Nicholas C. Pappas, Julia Blackwell Gelinas, Locke Reynolds, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

BAILEY, Judge

### Case Summary

Daniel Laguna ("Laguna"), and the estate of Carlos Guerrero ("Guerrero"), appeal the trial court's Order entering summary judgment in favor of Allison Engine Company ("Allison").

### Issue

The sole issue is whether Indiana should recognize the "product line exception" in product liability cases brought by injured persons against successor corporations.

### Facts/Procedural History

The facts in this case are not in dispute. On July 20, 1994, Guerrero and Laguna were involved in a helicopter accident at Fort Campbell, Kentucky. In this accident Guerrero died and Laguna was injured. The helicopter, an AH–6, was equipped with an Allison 250–C30 enhanced diffuser engine. Guerrero and Laguna allege that the helicopter stalled while in flight, causing it to crash to the ground. Guerrero and Laguna claim that Allison was negligent in the design and manufacture of the engine system. Further, Guerrero and Laguna claim that the engine system was defective and unreasonably dangerous. Guerrero and Laguna also assert a breach of implied warranty.

General Motors Corporation ("GM"), through its Allison Gas Turbine Division ("GM/Allison"), manufactured and sold the helicopter's engine on September 30, 1986. On March 31, 1990, a Commercial Engine Bulletin ("CEB 72–3176") was issued by GM/Allison, which called for the installation of enhanced engine diffuser assemblies on model 250–C30 engines. The enhanced engine diffuser assembly was installed into the subject engine on October 5, 1993, by Airwork, an independent company that was a GM authorized maintenance facility.

On December 1, 1993, Allison paid cash for the assets of GM/Allison. No stock was transferred as a part of the consideration of the sale. No members of GM's Board of Directors became members of Allison's Board of Directors. The sale of GM/Allison to Allison represented a relatively small percentage of GM's total as-

sets. As part of the purchase agreement, Allison assumed no liability for claims of damage, injury, or death arising from or relating to any product designed, manufactured, acquired, marketed or sold prior to the closing date of the asset sale.

After the asset sale, GM and Allison were separate and distinct companies. GM remained in business and was not dissolved. Allison adopted a new corporate logo and the GM logo was removed from equipment, vehicles, and signs purchased by Allison and FAA nameplates were changed. Allison used a different tax identification number and government cage code than that used by GM. Allison also obtained a new classified clearance from the United States government. Allison continued to manufacture the 250–C30 engine. Allison also continued to work on the enhanced diffuser changes to 250–C30 engines.

Following the parties' summary judgment hearing, the trial court denied Plaintiffs' Motion for Leave to File Amended Complaint against Allison, but granted Plaintiffs leave to file an Amended Complaint as to GM. Thereafter, Guerrero and Laguna amended their complaint to include a claim for damages against GM. GM answered Plaintiffs' Amended Complaint. Guerrero and Laguna appeal the trial court's Order entering summary judgment against them on their complaints for personal injuries against Allison.[1]

### Discussion

Guerrero and Laguna contend that Indiana should recognize the "product line exception" in product liability cases brought by injured parties against successor corporations. Specifically, Guerrero and Laguna argue the following:

> The fact that [Allison] continued to sell and service the identical product line with the same personnel at the same facility should result in its being liable to

Laguna and Guerrero for the defect in the enhanced diffuser which allegedly caused the helicopter crash at issue. Under such facts the "product line exception" to the general rule of successor non-liability should apply.

(Appellant's Brief at 9.)

#### A. Standard of Review

In reviewing a motion for summary judgment, this court applies the same standard as the trial court. We must determine whether there is a genuine issue of material fact and whether the law has been correctly applied by the trial court. Summary judgment is appropriate only if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Neither the trial court, nor the reviewing court, may look beyond the evidence specifically designated to the trial court. Once the movant for summary judgment has established that no genuine issue of material fact exists by submission of materials contemplated by T.R. 56, the nonmovant may not rest on his pleadings but must set forth specific facts, using supporting materials contemplated under the rule, which show the existence of a genuine issue for trial. A trial court's grant of summary judgment is 'clothed with a presumption of validity,' and the appellant bears the burden of demonstrating that the trial court erred.

*Stevenson v. Hamilton Mut. Ins. Co.*, 672 N.E.2d 467, 470–71 (Ind.Ct.App.1996) (internal citations and quotation omitted).

#### B. The Indiana Product Liability Act—Strict Liability

■ The Indiana Product Liability Act provides the following grounds for action:

> Sec. 1. Except as provided in section 3 of this chapter, a person who sells, leases, or otherwise puts into the stream

---

1. We held oral argument on February 24, 2000, at Franklin College in Franklin, Indiana.

of commerce any product in a defective condition unreasonably dangerous to any user or consumer or to the user's or consumer's property is subject to liability for physical harm caused by that product to the user or consumer or to the user's or consumer's property if:

(1) that user or consumer is in the class of persons that the seller should reasonably foresee as being subject to the harm caused by the defective condition;

(2) the seller is engaged in the business of selling the product; and

(3) the product is expected to and does reach the user or consumer without substantial alteration in the condition in which the product is sold by the person sought to be held liable under this article.

IND.CODE § 34–20–2–1. Indiana's Product Liability Act is a codification of the common law of products liability. *Whittaker v. Federal Cartridge Corp.*, 466 N.E.2d 480, 482 (Ind.Ct.App.1984).

■ An action for strict liability in tort against sellers and manufacturers of defective products is governed by Indiana Code § 34–20–2–3, which reads as follows:

A product liability action based on the doctrine of strict liability in tort may not be commenced or maintained against a seller of a product that is alleged to contain or possess a defective condition unreasonably dangerous to the user or consumer unless the seller is a manufacturer of the product or of the part of the product alleged to be defective.

One purpose of this section is to deter manufacturers from producing products that are unreasonably dangerous to foreseeable users. *See Maxon Corp. v. Tyler Pipe Industries, Inc.*, 497 N.E.2d 570, 578 (Ind.Ct.App.1986). "While a manufacturer is under no duty to produce accident proof products, it is legally bound to design and build products which are reasonably fit and safe for the purpose for which they are intended." *Liberty Mutual Ins. Co. v.*

*Rich Ladder Co., Inc.*, 441 N.E.2d 996, 999 (Ind.Ct.App.1982).

### C. The Indiana Product Liability Act and Freedom of Contract

■ In a product liability suit, it is not dispositive that an agreement exists between a successor corporation and its predecessor that the successor is not to assume the predecessor's liabilities. *Lucas v. Dorsey Corp.*, 609 N.E.2d 1191, 1201 (Ind.Ct.App.1993). In *McGraw–Edison Co. v. Northeastern Rural Electric Membership Corp.*, 678 N.E.2d 1120 (Ind.1997), our supreme court addressed the question of whether a disclaimer of liability in a purchase agreement barred a strict liability claim brought under Indiana's Product Liability Act.

We are interpreting the interplay between the provisions of the Uniform Commercial Code—Sales, IND.CODE § 26–2–2–719, which generally supports the enforceability of limitations of liability in commercial transactions, and the Indiana Product Liability Act, IND.CODE § 33–1–1.5–3, which codified strict liability and makes some of these choices that would otherwise be left to the court.

*Id.* at 1122. The Indiana Supreme Court reasoned and concluded as follows:

The General Assembly enacted the Product Liability Act against that background of its judicial patina and commentary as they sat in 1978 ... that climate was hostile to disclaimers.... [W]e conclude that the legislature has chosen to override the considerations of freedom of contract in the interest of encouraging safety of products and responsibility for products that are defective under the standards imposed by the statute. That is a judgment the legislature can make, and in Indiana our General Assembly has made it.

*Id.* at 1124–25. Justice Sullivan, in his dissent, summarized the rule of law announced in *McGraw–Edison Co.*, as follows: "the Product[s] Liability Act mandates that any disclaimer as to products

liability with respect to a product covered by the Act will be ineffective unless there has been a 'knowing waiver' of the purchaser's rights thereunder." *Id.* at 1125.

### D. Successor Corporation Non-Liability—General Rule and Exceptions

■ When one corporation purchases the assets of another, the buyer does not assume the debts and liabilities of the seller. *Sorenson v. Allied Products Corp.,* 706 N.E.2d 1097, 1099 (Ind.Ct.App.1999) (citing *Winkler v. V.G. Reed & Sons, Inc.,* 638 N.E.2d 1228, 1233 (Ind.1994)). However, there are four generally recognized exceptions to this rule:

(1) an implied or express agreement to assume the obligation; (2) a fraudulent sale of assets done for the purpose of escaping liability; (3) a purchase that is de facto consolidation or merger; or (4) instances where the purchase is a mere continuation of the seller.

*Id.* Under these exceptions, a successor corporation is liable only when the predecessor corporation no longer exists. *Id.*

### E. The Product Line Exception ·

■ The product line exception was originally articulated by the Supreme Court of California in *Ray v. Alad,* 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977).

[A] party which acquires a manufacturing business and continues the output of its line of products ... assumes strict tort liability for defects in units of the same product line previously manufactured and distributed by the entity from which the business was acquired.

*Id.* at 582, 560 P.2d at 11. Only a minority of states have adopted the product line exception. *See Garcia v. Coe Mfg. Co.,* 123 N.M. 34, 933 P.2d 243 (1997); *Martin v. Abbott Laboratories, Inc.,* 102 Wash.2d 581, 689 P.2d 368 (1984); *Dawejko v. Jorgensen Steel Co.,* 290 Pa.Super. 15, 434 A.2d 106 (1981); *Ramirez v. Amsted Indus., Inc.,* 86 N.J. 332, 431 A.2d 811 (1981).

### (1) The Majority View—Case Law and Rationale

As noted by Allison, the majority of courts have rejected the product line exception. (Appellee's Brief at 6.) · The rationales supporting the rejection of the product line exception were summarized as follows by the Colorado Court of Appeals, in *Johnston v. Amsted Industries, Inc.,* 830 P.2d 1141 (Colo.Ct.App.1992).

Strict liability should not be imposed because: the successor corporation did not create the risk nor did it directly profit from the predecessor's sale of the defective product; it did not solicit the use of the defective product nor make any representations as to its safety; and it is not able to enhance the safety of a product that is already on the market.

*Id.* at 1144 (citing *Bernard v. Kee Mfg. Co.,* 409 So.2d 1047 (Fla.1982), *Domine v. Fulton Iron Works,* 76 Ill.App.3d 253, 32 Ill. Dec. 72, 395 N.E.2d 19 (1979), *Jones v. Johnson Machine & Press Co.,* 211 Neb. 724, 320 N.W.2d 481 (1982), *Ostrowski v. Hydra–Tool Corp.,* 144 Vt. 305, 479 A.2d 126 (1984), *Fish v. Amsted Industries, Inc.,* 126 Wis.2d 293, 376 N.W.2d 820 (1985)). The *Johnston* court further recognized case law holding that the product line exception was inconsistent with the principles of strict liability and resulted in the imposition of liability without a corresponding duty. Supporting case law further states that the product line exceptions to successor corporation non-liability should be left to the legislature and that this exception threatens the viability of small successor businesses. (Citing *Guzman v. MRM/Elgin,* 409 Mass. 563, 567 N.E.2d 929 (1991), *Downtowner, Inc. v. Acrometal Products, Inc.,* 347 N.W.2d 118 (N.D.1984), *Fish v. Amsted Industries Inc.,* 126 Wis.2d 293, 376 N.W.2d 820, *Leannais v. Cincinnati, Inc.,* 565 F.2d 437 (7th Cir.1977), and *Bernard v. Kee,* 409 So.2d 1047.) In determining whether to adopt the product line exception in this case, this Court looks to the factors we

consider when applying the "traditional" exceptions to successor non-liability and those reasons driving the application of the product line exception in other jurisdictions.

In *Sorenson v. Allied Products Corporation*, 706 N.E.2d 1097 (Ind.Ct.App.1999), the estate of a mechanic who had died from asbestos exposure brought a products liability suit against Allied Products Corporation ("Allied") which had acquired the assets of the bankrupt manufacturer of the same brakes and clutches which exposed the mechanic to asbestos. The estate argued that the transaction between Allied and the bankrupt manufacturer amounted to a de facto merger, and as such Allied was liable via an exception to the general rule of successor non-liability.

We held that the estate failed to establish the requisite elements of the "de facto merger" exception, noting that the predecessor's "shareholders never held any stock in Allied," that there was not "continuity of management, personnel, and physical location" between Allied and its predecessor, and the predecessor "shareholders never dissolved that corporation." *Id.* at 1099–1100. We next discussed the applicability of another exception to the successor non-liability rule, namely the "assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor," and articulated the following test:

> The test for a mere continuation of the seller[']s business is not the continuation of the business operation, but rather the continuation of the corporate entity. An indication that the corporate entity has been continued is a common identity of stock, directors, and stockholders and the existence of only one corporation at the completion of the transfer.

*Id.* at 1100 (citing *Travis v. Harris Corp.*, 565 F.2d 443, 447 (7th Cir. 1977)). Considering the same factors which precluded the application of the "de facto merger" exception, we held that Allied's purchase of its predecessor "did not qualify as a mere continuation of the seller's business." *Id.* Accordingly, we affirmed the trial court's grant of summary judgment in favor of Allied. *Id.*

In *Travis v. Harris*, 565 F.2d 443, the Seventh Circuit considered whether Indiana would adopt the product line exception. In *Travis*, the plaintiff injured his hand in a die press machine. Travis and his wife filed suit against Harris Corporation ("Harris"), as one of the alleged corporate successors to the manufacturer of the die press, seeking damages in strict liability and for negligence in the design, manufacture, and distribution of the die press. *Id.* at 445. After rejecting plaintiffs' "de facto merger" and "mere continuation" arguments, the court considered the product line exception. The *Travis* court found "no basis for adding to the laws of Ohio or Indiana a 'product line' theory" on which Harris might be liable. *Id.* at 448. The *Travis* court held that the following language from *Leannais v. Cincinnati, Inc.*, 565 F.2d 437, was equally applicable to the courts of Ohio and Indiana:

> [T]he record contained no indication that the courts of Wisconsin 'have created, or would create, such a far-reaching exception to the non-liability of asset purchasers, so long the basis of economic decisions by its citizens.'

*Travis v. Harris*, 565 F.2d at 448 (quoting *Leannais v. Cincinnati, Inc.*, 565 F.2d at 441).

The Seventh Circuit revisited the product line exception in *South Bend Lathe, Inc. v. Amsted Industries, Inc.*, 925 F.2d 1043 (7th Cir. 1991). In *South Bend Lathe, Inc.*, the buyer of a business sued the seller pursuant to an indemnity provision in the purchase agreement for amounts buyer paid in product liability claims and attorney fees for defective products. On appeal, a part of seller's argument against indemnification was that buyer's claims arose under the product line exception, which had not been adopted by any state appellate court when the parties' purchase agreement was executed in

1975. *Id.* at 1044–45. The Seventh Circuit focused upon the unambiguous language of the purchase agreement (and seller's failure to argue otherwise), in determining that it was "irrelevant that product line liability did not exist at the time that the parties executed the Agreement." *Id.* at 1046. Nevertheless, the court went on to consider the applicability of the product line exception. The court held that since the buyer's predecessor remained "a viable company capable of satisfying judgments against it," such fact would bar recovery under the product line exception. *Id.* at 1047. Accordingly, the Seventh Circuit ruled that it was the contractual language of the parties' purchase agreement that caused the seller to be liable for the product liability claims at issue. *Id.* at 1048.

### (2) The Minority View—Case Law and Rationale

#### a. The Supreme Court of California

In *Ray v. Alad,* 19 Cal.3d 22, 136 Cal. Rptr. 574, 560 P.2d 3, the plaintiff was injured when he fell off a defective ladder manufactured by the Alad Corporation ("Alad I"). By means of a cash transfer, the successor corporation ("Alad II") acquired all the assets of Alad I, and continued to manufacture the same product, using the same personnel and equipment, and soliciting the same customers. Shortly after the transfer, Alad I was dissolved. The court provided three justifications for imposing liability on Alad II:

> The virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading rule, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.

*Ray v. Alad,* 136 Cal.Rptr. 574, 560 P.2d at 9. Accordingly, the court held that a successor corporation that "acquires a manufacturing business and continues the output of its line of products under the circumstances here presented assumes strict tort liability for defects in units of the same product line previously manufactured and distributed by the entity from which the business was acquired." *Id.* 136 Cal. Rptr. 574, 560 P.2d at 11.

#### b. The Supreme Court of New Mexico

In *Garcia v. Coe Mfg. Co.,* 123 N.M. 34, 933 P.2d 243, an employee who worked at a fiberboard plant came into contact with a conveyor. The conveyor pulled the employee underneath and crushed him to death. The employee's estate brought a products liability action against Coe Manufacturing Company ("Coe"). Coe had purchased the assets of its predecessor corporation, which had manufactured the conveyor. The court rejected the estate's argument that Coe was a mere continuation of its predecessor, as Coe did not share the same directors, officers or shareholders with its predecessor. *Id.* at 247. However, the court went on to consider the product line exception:

> When a successor corporation continues to market many of the same products and represents to the public and it's predecessor's customers that it is continuing the predecessor's enterprise, it essentially picks up where the predecessor left off. Whether liability should be imposed depends on whether the successor has the same ability as its predecessor to assess, control, and distribute the risks and costs of injuries caused by a product defect. If it does, we must still determine whether under the facts of a particular case this ability is nevertheless outweighed by the policies underlying the contract-law-based rule of successor corporation nonliability-chiefly, promoting the alienability of corporate assets.

*Id.* at 248 (citing *Ray v. Alad Corp.,* 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3, 9–11). The court acknowledged that the product line exception had been rejected by many courts. *Garcia v. Coe,* 933 P.2d at 249 (citing Timothy E. Travers, et al., *American Law of Products Liability* § 7:27, at 44 (3d ed.1994)). However, the court chose to adopt the product line exception, reasoning in part as follows: "[A] successor [corporation] is positioned to assess the risks before purchasing the assets, and to then decide whether to assume the potential burden associated with its acceptance of the predecessor's goodwill by continuing to produce the same product line." Moreover, "because 'strict liability focuses on the product,' and not on conduct, it is not unfair to assess liability to successor manufacturers who have purchased the right to benefit from selling and servicing the product." *Id.* at 249–250 (quoting *Brooks v. Beech Aircraft Corp.,* 120 N.M. 372, 378, 902 P.2d 54, 60 (1995)).

Having adopted the product line exception, the court determined that there may be genuine issues of material fact affecting its application, and reversed the summary judgment dismissing the estate's strict liability claim.

### c. The Supreme Court of New Jersey

In *Ramirez v. Amsted Industries, Inc.,* 86 N.J. 332, 431 A.2d 811, the plaintiff was injured while operating an allegedly defective power press on the premises of his employer. Plaintiffs filed suit against Amsted Industries, Inc. ("Amsted") as a successor corporation to Johnson Machine & Press Company ("Johnson"), the manufacturer of the machine involved. The trial court granted Amsted's motion for summary judgment.

On appeal, the court recognized that the purchase agreement between successor and predecessor "manifested a clear intent to negate any assumption of liability by Amsted for contingent product claims," yet agreed with plaintiffs' assertion "that a corporation that purchases the assets of a manufacturer and continues the business of the selling corporation in an essentially unchanged manner should not be allowed to use the exculpatory contractual language to avoid liability for contingent personal injury claims arising out of defects in the predecessor's product." *Id.* at 813.

Upon granting Amsted's petition for certification, the Supreme Court of New Jersey affirmed the judgment of the Appellate Division, echoing the rationales first heard in *Ray v. Alad,* 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3. "First, the plaintiffs potential remedy against Johnson, the original manufacturer of the allegedly defective press, was destroyed by the purchase of the Johnson assets, trade name and good will, and Johnson's resulting dissolution." *Id.* at 820. "Second, the imposition of successor corporation liability upon Amsted is consistent with the public policy of spreading the risk to society at large for the cost of injuries from defective products." *Id.* "Third, the imposition upon Amsted of responsibility to answer claims of liability for injuries allegedly caused by defective Johnson presses is justified as a burden necessarily attached to its enjoyment of Johnson's trade name, good will and the continuation of an established manufacturing enterprise." *Id.* at 822.

### Analysis

■ Guerrero and Laguna allege that the enhanced engine diffuser in the subject helicopter was defective and unreasonably dangerous. One of the purposes of the strict liability section of the Indiana Product Liability Act is to deter manufacturers from producing products that are unreasonably dangerous to foreseeable users. *See Maxon,* 497 N.E.2d at 578. Thus, on its face, Guerrero and Laguna's Complaint alleges facts falling under the Indiana Product Liability Act.

Guerrero and Laguna base their product liability claim on the doctrine of strict liability in tort. Accordingly, they must establish that Allison was the manufacturer of the allegedly defective part. *See* IND.

CODE § 34–20–2–3. To this end, Guerrero and Laguna argue that Allison, as the successor to the assets of GM/Allison, should be held liable for any defect in the enhanced engine diffuser originally manufactured by Allison/GM. Guerrero and Laguna urge us to impute liability to Allison through application of the product line exception to the traditional rule of corporate successor non-liability.

In applying the four generally recognized exceptions to the successor non-liability rule, we have held that a successor corporation is liable only when the predecessor corporation no longer exists. *See Sorenson,* 706 N.E.2d at 1099. A similar requirement is found among that minority of states applying the product line exception. *See* e.g. *Ray,* 136 Cal.Rptr. 574, 560 P.2d at 9 (holding that one of the justifications for imposing liability on a successor corporation was "the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business").

Here, Allison's purchase of GM/Allison did not destroy Guerrero and Laguna's potential remedy against GM. Therefore, we do not reach the other supporting rationales of the product line exception; namely, whether Allison had the same ability to spread the risks and costs of injuries allegedly caused by the enhanced engine diffuser, and whether it is fair to impose liability upon Allison for an allegedly defective part manufactured by GM.

### Conclusion

The product line exception *may* be an appropriate means by which to balance the seemingly juxtaposed concepts of strict liability under the Indiana Product Liability Act, and freedom of contract – long supported by common law, as well as both state and federal constitutions. However, considering that the predecessor corporation continues to exist, the inequities which would warrant our full consideration of this proposed fifth exception to successor non-liability under Indiana law are not present. Accordingly, Guerrero and La-guna's Complaint against Allison neither alleges facts to which the four generally accepted exceptions to the successor non-liability rule apply, nor asserts claims from which this Court need consider applying a legal theory novel to the state of Indiana. Thus, the trial court's grant of summary judgment in favor of Allison is affirmed.

Affirmed.

NAJAM, J., and MATTINGLY, J., concur.